Filed 11/18/22  P. v. Rubio-Baez CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARCO ANTONIO RUBIO-BAEZ,<br><br>        Defendant and Appellant. | A163056<br><br>(San Mateo County Super. Ct. No. SC077948A) |

Defendant and appellant Marco Antonio Rubio-Baez was convicted of robbery on a plea of no contest in 2013.  In 2021, he moved to vacate the conviction pursuant to Penal Code section 1473.7,[1] which permits individuals who are no longer in custody to move to vacate a conviction or sentence on the ground that it is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of" the plea.  (§ 1473.7, subd. (a)(1).)  He appeals from the denial of this motion.  We affirm.

---

[1]  Further statutory references will be to the Penal Code except as otherwise specified.

1

# BACKGROUND

## I.

### *The 2013 Conviction*

In 2013, Rubio-Baez was apprehended near a bank that had just been robbed, identified by bank employees as the person who had committed the robbery, and found to be in possession of the stolen bag of money and .31 gram of methamphetamine. The victim reported that Rubio-Baez had handed him a demand note, said he had five minutes to give him the money and started counting; the victim handed him a bag containing $4,000 cash and Rubio-Baez left. Rubio-Baez told the police he entered the bank with the intent to commit a robbery, gave a demand note to a banker and told him he had five seconds to hand over the money, then fled the bank with the money the banker gave him. Rubio-Baez said he knew it was wrong to rob the bank, but he needed the money to pay rent, buy a cell phone and send money to his mother in Mexico.

Rubio-Baez was charged with second degree robbery (§ 212.5, subd. (c)),[2] possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), burglary (§ 460, subd. (b)), theft of property exceeding $950 (§ 487, subd. (a)), and possession of stolen property (§ 496, subd. (a)). Pursuant to a negotiated plea agreement, he entered a plea of no contest to the robbery charge and admitted the offense was a serious felony under section 1192.7, subdivision (c)(19), and a violent felony under section 667.5,

---

[2] The definition of robbery appears in section 211. Section 212.5 describes the degrees of robbery: Subdivisions (a) and (b) list types of robbery constituting first degree robbery and subdivision (c) specifies that "[a]ll kinds of robbery other than those listed in subdivisions (a) and (b) are of the second degree."

subdivision (c)(9). The remaining counts were dismissed, as were two separate misdemeanor cases.

The plea form Rubio-Baez signed stated, "I understand that if I am not a citizen, conviction of the offense for which I have been charged **will** have the consequences of <u>deportation</u>, <u>exclusion</u> from the United States or a denial of naturalization." The form also stated that counsel had explained that the maximum penalty for the offense was five years in prison, four years parole, and specified fines; that the offense was a strike; and that Rubio-Baez had not been induced to plead guilty or nolo contendere by any promise or representation except, "2 year TOP & refer consider residential treatment program—indicated" and dismissal of two misdemeanor cases with *Harvey* waivers.[3]

At the hearing on the plea, Rubio-Baez responded "yes" when the court asked, "Do you understand that if you are not a citizen of this country this conviction will have the consequence of deportation, exclusion from admission to the United States and denial of naturalization." The court explained that the low term of two years was an indicated sentence and not a promise, and that the sentencing court could impose up to the maximum term of five years, and Rubio-Baez acknowledged he understood.

At sentencing, noting its view that Rubio-Baez realized his offense was "a big mistake" and "because of [his] drug use," the trial court suspended imposition of sentence and placed Rubio-Baez on three years' supervised probation with one year in county jail, modifiable to a residential treatment program approved by probation.

---

[3] *People v. Harvey* (1979) 25 Cal.3d 754.

In 2016, Rubio-Baez's conviction was dismissed in the interests of justice pursuant to section 1203.4.[4]

## II.

### *The Current Motion to Vacate*

On January 26, 2021, Rubio-Baez filed a motion to withdraw his no contest plea pursuant to section 1437.7 on the ground that when he entered his plea, he was unaware the conviction would render him subject to "mandatory removal and certain denial of benefits from the United States." The motion emphasized the complexity of immigration law and fact that the Ninth Circuit did not clarify that a robbery conviction was an "aggravated felony" for purposes of immigration law until years after Rubio-Baez's plea.

Rubio-Baez submitted a declaration in which he stated that he entered the plea "based on the understanding that [he] would not have any serious immigration consequences," he "did not meaningfully understand that this conviction could become [a] removable offense many years after my plea because of the complexities of immigration law," and he "would not have accepted this plea if [he] knew that this conviction could result in certain removal and denial of benefits and relief." Rubio-Baez declared that "[t]he right to remain in the United States was more important to [him] than any potential jail sentence" and that he "had family, community ties, obligations, and opportunities in the United States" and "would have faced extreme

---

[4] Section 1203.4, with certain exceptions, provides for dismissal of a conviction when the defendant " 'has fulfilled the conditions of probation for the entire period of probation,' " " 'has been discharged prior to the termination of the period of probation,' " or " 'in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under' section 1203.4." (*People v. Seymour* (2015) 239 Cal.App.4th 1418, 1429-1430, quoting section 1203.4, subdivision (a).)

hardship if [he] was deported to [his] country." According to his declaration, at the time of his plea, Rubio-Baez was "going through terrible depression due to a [serious] family illness," and he had since recovered through involvement with church and a rehabilitation program, had become a "conscientious productive member of society" and had not gotten into further trouble with the law.

Rubio-Baez declared that he had been in the United States "a long time" and had "graduated high school here in 2005." He had obtained a "U visa"[5] in 2011, which allowed him to work legally, and had been gainfully employed ever since. At the time of his plea he was afraid to return to his home state in Mexico, which was "very dangerous" due to crimes such as abductions, robberies and killings, and was on the "U.S. Travel's Do not travel list." Rubio-Baez declared, "I would not have knowingly taken a plea that would risk going back there and giving up my U.S. life and my U-visa status. [¶] There was little to gain by accepting the plea offer, if I'm forced to return to my country and spend years in immigration custody."[6]

---

[5] A U visa is "a temporary nonimmigrant visa created by Congress to provide legal status for noncitizens who assist in the investigation of serious crimes in which they have been victimized. (See 8 U.S.C. § 1101(a)(15)(U); *Fonseca-Sanchez v. Gonzales* (7th Cir. 2007) 484 F.3d 439, 442, fn. 4.)" (*People v. Morales* (2018) 25 Cal.App.5th 502, 506.)

According to the 2013 probation report, "[i]n 2001 [Rubio-Baez] was reportedly granted legal residency, as he was the victim of domestic violence by an ex-partner." Rubio-Baez's declaration states that he obtained a U visa in January 2011, and a copy of the visa documents its validity from January 27, 2011, to January 26, 2015.

[6] Rubio-Baez's attorney stated at the hearing that conviction of an aggravated felony would preclude Rubio-Baez from obtaining a bond for release if he was put into removal proceedings.

At the hearing, Rubio-Baez testified that he came to the United States in 2003, at age 17.  When he entered his plea in 2013, he did not know it would subject him to mandatory removal for life and no one ever talked to him about the term " 'aggravated felony.' "  He would not have taken the plea bargain if he had known of these consequences because "it's really important for me to be in the United States since I've been in the United States for a long time" and "I've been here since I was 17 years old, so it is really important for me to be around my family."

Rubio-Baez's current attorney stipulated that a section 1016.5 advisement[7] was given at the time of the plea.  Rubio-Baez acknowledged that his plea form highlighted a provision stating, " 'you will be subject to deportation,' " but testified that this did not mean he understood the consequences because he never got to discuss it with an immigration attorney and his public defender did not "have the whole knowledge of this."  He told his attorney about his immigration status and the attorney's response was, " 'This is the deal that I got for you.' "  The attorney did not offer Rubio-Baez an opportunity to speak with an immigration lawyer and he did not know he could do so.  Rubio-Baez acknowledged that the trial court at his plea hearing told him the conviction " 'will have consequences of deportation' " but testified, "that doesn't mean I understand fully what those consequences

---

[7] Section 1016.5, subdivision (a), provides:  "Prior to acceptance of a plea of guilty or nolo contendere to any offense punishable as a crime under state law, except offenses designated as infractions under state law, the court shall administer the following advisement on the record to the defendant:

"If you are not a citizen, you are hereby advised that conviction of the offense for which you have been charged may have the consequences of deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States."

were meant to be in the future. [¶] . . .[¶] It's not telling me that I'll be deported for life. It's not telling me that if I get deported to Mexico, I would never to come back to the states as other people get the chance."

Rubio-Baez testified that he went back to court in 2016 to get his conviction dismissed because he was "trying to find a better solution" or "adjust my status," and this was when he learned he was "stuck" because of the plea. He was not currently facing deportation, exclusion or denial of a naturalization application.

Defense counsel argued the only relevant question under section 1473.7 is whether Rubio-Baez understood the consequences of his plea, regardless of the reasons for any lack of understanding. His main argument was that in 2013 the law "was misunderstood" as providing that robbery was not an aggravated felony, so there was "no way anybody could have known these radical consequences." Counsel maintained that the fact it took until 2019 for the Ninth Circuit to clarify the law "shows the complexity of immigration law when it refers to this statute. And if it's so complex that attorneys and appellate courts couldn't figure this out until 2019, how could a layperson understand it?"

Counsel also argued it did not matter whether another plea deal was available, only whether Rubio-Baez understood the consequences of this one. Counsel maintained that Rubio-Baez's assertions were corroborated by the facts that he had a U visa and gainful employment, making it less likely he would knowingly "take something unsafe"; he had a fear of returning to Mexico; and he had a long history of ties to the United States. Counsel further argued that the motion to vacate should be granted in the interest of justice; that Rubio-Baez had already served his time and become a productive member of society, leaving only the immigration consequences of his offense

at stake; and that the 2016 dismissal of the conviction under section 2013.4 meant it should be "good enough to be dismissed" now.

## III.

### *The Trial Court's Decision*

The court emphasized the fact that the plea form and on the record advisement from the court informed Rubio-Baez that the consequences of the plea "will be deportation, exclusion from admission to the United States, or denial of naturalization": "He was advised not 'can' or 'could.' He was advised these will be the consequences . . . ." Acknowledging that Rubio-Baez had served his time and appeared to be a contributing member of society, the court stated the issue "is whether or not I can find [Rubio-Baez] truly didn't know what he was doing or didn't understand what he was getting into when he pled way back in 2013. And based on this record, I cannot make that finding." Given that Rubio-Baez knew he was pleading to a "very serious offense," the court found it sufficient that he was advised the conviction "will lead to deportation."

The court found no corroboration for Rubio-Baez's statements, noting that the only evidence of what his plea attorney did or did not tell him came from Rubio-Baez; there was no evidence about the strength of the case against him; the plea bargain included not only a top sentence of two years but also dismissal of two separate misdemeanor cases; and there was no evidence Rubio-Baez had reason to expect or hope for a different bargain. The court also found parts of Rubio-Baez's declaration vague: He said he had family in the United States, but he did not have a wife or children at that time, and he did not explain what he meant by community ties or obligations. His rehabilitation and good conduct after the offense, the court observed, was

8

not relevant to his understanding of the consequences of the plea at the time he entered it.

In short, the court found "the only thing really . . . contrary to the plea form and the transcript [of the plea hearing] [is] his declaration from many, many years later."

The court denied the section 1473.7 motion and this appeal followed.

## DISCUSSION

## I.

### *Principles Governing a Section 1473.7 Motion to Vacate*

As the California Supreme Court has explained, "[w]hen long-standing noncitizen residents of this country are accused of committing a crime, the most devastating consequence may not be a prison sentence, but their removal and exclusion from the United States. (See *People v. Martinez* (2013) 57 Cal.4th 555, 563 (*Martinez*).) Because the prospect of deportation 'is an integral part,' and often even 'the most important part,' of a noncitizen defendant's calculus in responding to certain criminal charges (*Padilla v. Kentucky* (2010) 559 U.S. 356, 364 (*Padilla*)), both the Legislature and the courts have sought to ensure these defendants receive clear and accurate advice about the impact of criminal convictions on their immigration status, along with effective remedies when such advice is deficient. (E.g., Pen. Code, §§ 1016.2 et seq., 1473.7; *Jae Lee v. United States* (2017) __ U.S. __, [137 S.Ct. 1958], 198 L.Ed.2d 476 (*Lee*); *Padilla*, at p. 360, 130 S.Ct. 1473; *Martinez*, at p. 559; *People v. Superior Court* (*Giron*) (1974) 11 Cal.3d 793, 798.)" (*People v. Vivar* (2021) 11 Cal.5th 510, 516 (*Vivar*).)

Section 1473.7, subdivision (a)(1), provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction" on the ground that it "is legally invalid due to prejudicial error damaging the

9

moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." If the moving party establishes this ground for relief by a preponderance of the evidence, the court "shall" grant the motion. (§ 1473.7, subd. (e)(1).) "When ruling on a motion under paragraph (1) of subdivision (a), the only finding that the court is required to make is whether the conviction is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (e)(4).)

"[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances. (*Lee*, *supra*, [582] U.S. __, [137 S.Ct. at p. 1966].) Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible. (See *id*. at p. __ [137 S.Ct. at pp. 1967-1969]; *Martinez*, *supra*, 57 Cal.4th at p. 568.)" (*Vivar, supra,* 11 Cal.5th at pp. 529-530.)

"[M]ovants under section 1473.7 must provide evidence corroborating their assertions. ' "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his

attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." ' (*People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 78, quoting [*Lee, supra,*] 582 U.S. —, [137 S.Ct. 1958, 1967] [discussing how to evaluate the 'reasonable probability' that a defendant who would have rejected a plea deal but for counsel's erroneous advice about deportation in an ineffective assistance of counsel case].)" (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 322 (*Rodriguez*); *Vivar, supra,* 11 Cal.5th at p. 530 ["when a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with ' "objective evidence" ' "].)

"[A]ppeals from section 1473.7 hearings are subject to independent review. (*Vivar, supra*, 11 Cal.5th 510, 525.) Under this standard, ' "an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." ' (*Ibid.*) Independent review extends particular deference to trial court findings 'that are based on " 'the credibility of witnesses the [superior court] heard and observed' " ' but not to findings drawn from the 'cold record' in the proceeding, since the trial and appellate courts are in the same position when tasked with interpreting such materials. (*Id.* at p. 527.)" (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 755.)

## II.

### *Relevant Federal Immigration Principles*

"The Immigration and Nationality Act (INA) renders deportable any alien convicted of an 'aggravated felony' after entering the United States. 8 U.S.C. § 1227(a)(2)(A)(iii). Such an alien is also ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to

11

remain in the country. See §§ 1229b(a)(3), (b)(1)(C). Accordingly, removal is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here." (*Sessions v. Dimaya* (2018) ___ U.S. ___, [138 S.Ct. 1204, 1210-1211].) As relevant here, the term "aggravated felony" includes "a crime of violence . . . for which the term of imprisonment [is] at least one year" (8 U.S.C. § 1101(a)(43)(F)) and "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year" (8 U.S.C. § 1101(a)(43)(G)).[8]

To decide whether a state conviction "qualifies as an 'aggravated felony' under the INA," federal courts "employ a 'categorical approach' to determine whether the state offense is comparable to an offense listed in the INA." (*Moncrieffe v. Holder* (2013) 569 U.S. 184, 190.) "Under this approach we look 'not to the facts of the particular prior case,' but instead to whether 'the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition of a corresponding aggravated felony." (*Ibid.*) "[A] state offense is a categorical match with a generic federal offense only if a conviction of the state offense ' "necessarily" involved . . . facts equating to [the] generic [federal offense].' " (*Ibid.,* quoting *Shepard v. U.S.* (2005) 544 U.S. 13, 24 (plur. opn.).) " 'The prior conviction qualifies as [the generic offense] only if the statute's elements are the same as, or narrower than, those of the generic offense.' [(*Descamps v. U.S.* (2013) 570 U.S. 254, 257.)] A state offense qualifies as a generic offense—and therefore, in this case, as an

---

[8] Regarding the bracketed insertion of "is" into the quoted portions of title 8 of the United States Code (8 U.S.C.), section 1101(a)(43), federal courts have concluded that "the verb 'is' is missing from the statute and should be read into it." (*U.S. v. Corona-Sanchez* (9th Cir. 2002) 291 F.3d 1201, 1204, fn. 3.)

12

aggravated felony—only if 'the "full range of conduct covered by [the state statute] falls within the meaning" ' of the generic offense." (*U.S. v. Alvarado-Pineda* (9th Cir. 2014) 774 F.3d 1198, 1202 (*Alvarado-Pineda*).)

Prior to 2011, the Ninth Circuit treated robbery under section 211 as a crime of violence under 8 U.S.C. § 1101(a)(43)(F). (*U.S. v. Martinez-Hernandez* (9th Cir. 2019) 932 F.3d 1198, 1203 (*Martinez-Hernandez*).) "But, in 2011, the California Supreme Court clarified that [section] 211 can be violated by the accidental use of force" (*ibid.*, citing *People v. Anderson* (2011) 51 Cal.4th 989), and the Ninth Circuit subsequently held in 2015 that a section 211 conviction is not categorically a violent felony as defined in the Armed Career Criminal Act (18 U.S.C. § 924(e)(1)). (*Martinez-Hernandez,* at p. 1203.) In 2019, *Martinez-Hernandez* confirmed that a section 211 conviction also is not categorically an aggravated a violent felony under the INA. (*Martinez-Hernandez,* at p. 1203.)[9]

*Martinez-Hernandez* held, however, that a section 211 conviction *is* an aggravated felony under 8 U.S.C. § 1101(a)(43)(G), "a theft offense . . . for which the term of imprisonment at [is] least one year." (*Martinez-Hernandez, supra,* 932 F.3d at pp. 1206-1207.) The court noted that the Ninth Circuit had "not addressed in a published opinion whether [section] 211 robbery is categorically a generic theft offense under 8 U.S.C. § 1101(a)(43(G)" but, in 2014, had "held that a virtually identical Washington statute . . . was a categorical theft offense." (*Martinez-Hernandez,* at p. 1206, citing *Alvarado-Pineda, supra,* 774 F.3d at p. 1202.)

---

[9] The definition of "violent felony" used in the INA is "materially indistinguishable" from the definition used in the Armed Career Criminal Act. (*Martinez-Hernandez, supra,* 932 F.3d at p. 1203; 8 U.S.C. § 1101(a)(43)(F); 18 U.S.C. § 16(a); 18 U.S.C. § 924(e)(2)(B)(i).)

## III.

### *Analysis*

**A.  Rubio-Baez Failed to Demonstrate an Error Prejudicing His Ability to Understand the Immigration Consequences of His Plea.**

Rubio-Baez maintains that when he entered his plea of no contest to robbery in 2013, he was not aware this offense was an aggravated felony for purposes of federal immigration law, conviction of which would make him inadmissible to the United States for life and preclude relief from removal. He urges that he made a mistake in believing he would not have immigration consequences because he had a U visa, and therefore did not "meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of the plea."

As Rubio-Baez emphasizes, "[p]rejudicial error" for purposes of section 1473.7 may result from "the moving party's *own* mistake of law or inability to understand the potential adverse immigration consequences of the plea."  (*People v. Jung* (2020) 59 Cal.App.5th 842, 856, disapproved on other grounds in *Vivar, supra,* 11 Cal.5th at p. 526, fn. 4; *Rodriguez, supra,* 68 Cal.App.5th at p. 321; *People v. Mejia* (2019) 36 Cal.App.5th 859, 871 (*Mejia*); *People v. Camacho* (2019) 32 Cal.App.5th 998, 1009 (*Camacho*).)  But, as earlier noted, it is not enough for the moving party to simply assert he or she did not fully understand the consequences of a plea; the assertions must be corroborated with " ' "objective evidence." ' "  (*Vivar, supra,* 11 Cal.5th at p. 530.)

Here, Rubio-Baez stated in his declaration and testimony that at the time of his plea he understood it "would not have any serious immigration consequences," did not understand the conviction "could become [a] removable offense many years after [the] plea because of the complexities of

14

immigration law," and would not have accepted the plea bargain if he had known the conviction could result in "certain removal and denial of benefits and relief." He testified that when he told his public defender about his immigration status, the attorney responded that "this is the deal that I got for you"; he was never offered the opportunity to speak with an immigration attorney; and the public defender did not "have the whole knowledge of this."

In denying the motion, the trial court stressed that the plea form and the oral advisement from the court at the plea hearing both informed Rubio-Baez that the consequences of the plea "will" be deportation, exclusion from admission to the United States, or denial of naturalization, not just that these consequences might result. Given this language and the fact that Rubio-Baez was pleading to a "very serious offense," the trial court found it was not necessary for him to have been told the immigration consequences would be "permanent." As we have said, the trial court found no corroboration for Rubio-Baez's statements, concluding "the only thing really . . . contrary to the plea form and the transcript [of the plea hearing] [is] his declaration from many, many years later."

Rubio-Baez argues that his inability to understand that a robbery conviction qualifies as a theft offense, and therefore an aggravated felony, under federal immigration law was corroborated by "contemporaneous objective facts" (*Vivar, supra,* 11 Cal.4th at p. 530) in that federal courts, at the time of his plea in 2013, had not held in a published opinion that robbery under section 211 is categorically an aggravated felony theft offense under the INA. This point was only clarified, he asserts, by the federal Board of Immigration Appeal in 2016 (*Matter of Ibarra* (BIA 2016) 26 I&N Dec. 809, 810) and by the Ninth Circuit in 2019 (*Martinez-Hernandez, supra,* 932 F.3d 1198, 1205).

15

The fact that the Ninth Circuit had not issued a published opinion holding robbery under section 211 to be an aggravated felony as a theft offense under 8 U.S.C. section 1101(a)(43)(G) does not necessarily indicate the issue was as complicated as Rubio-Baez portrays it. Rubio-Baez does not suggest that, prior to the decisions he cites, the Ninth Circuit held robbery under section 211 was *not* an aggravated felony as a "theft offense"; it had been treated as a "crime of violence" aggravated felony. The alternate basis for concluding robbery is an aggravated felony became significant, we presume, only after the Ninth Circuit, in response to the California Supreme Court's clarification of California law in 2011, stopped treating section 211 robbery as a crime of violence. (*Martinez-Hernandez*, *supra*, 932 F.3d at p. 1203.)

Although *Martinez-Hernandez* was not decided until 2019, there would have been no reason for anyone with knowledge of immigration law, considering the question in 2013, to expect federal courts would not treat a conviction under section 211 as a "theft offense" aggravated felony.[10] It had long been established that federal courts determine whether a state conviction is an "aggravated felony" under federal law by use of the categorical approach, comparing the statutory definition of the state crime with the generic federal definition of the corresponding federal offense. (*Gonzales v. Duenas-Alvarez* (2007) 549 U.S. 183, 185-186; *Huerta-Guevara v.*

---

[10] The People point to the *Martinez-Hernandez* court's discussion of *Alvarado-Pineda,* in which the Ninth Circuit held that a Washington statute "virtually identical" to section 211 "was a categorical theft offense." (*Martinez-Hernandez, supra,* 932 F.3d at p. 1206, citing *Alvarado-Pineda, supra,* 774 F.3d at pp. 1202-1203.) *Alvarado-Pineda,* while predating *Martinez-Hernandez* by several years, was still decided several years *after* Rubio-Baez's plea.

*Ashcroft* (9th Cir. 2003) 321 F.3d 883, 886-887; *Taylor v. U.S.* (1990) 495 U.S. 575, 602.) The federal definition of a "generic" theft offense relied upon in *Martinez-Hernandez* and *Alvarado-Pineda* had been established well before Rubio-Baez entered his plea. (E.g., *Mandujano-Real v. Mukasey* (9th Cir. 2008) 526 F.3d 585, 589-590; *U.S. v. Corona–Sanchez* (9th Cir. 2002) 291 F.3d 1201, 1205 (en banc), superseded by statute on other grounds; *Gonzales v. Duenas-Alvarez*, at p. 189 [noting generic definition of theft adopted by Ninth Circuit also adopted by "other Circuits and the BIA"].) The federal definition, as we have said, is " 'a taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of the rights and benefits of ownership.' " (*Martinez-Hernandez,* at p. 1205, quoting *Alvarado-Pineda, supra,* 774 F.3d at p. 1202.) Section 211 defines robbery as the "felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear"; " 'felonious taking' " means "a taking accomplished with felonious intent, that is, the intent to steal." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938-939.) As *Alvarado-Pineda* and *Martinez-Hernandez* demonstrate, a straightforward comparison of the elements of the state and federal offenses shows "the 'full range of conduct' criminalized by [section 211] falls within the meaning of generic theft in that both require (1) the taking of (2) personal property (3) without consent and (4) with the specific intent to steal" (*Alvarado-Pineda, supra,* 774 F.3d at p. 1203), making the state offense categorically a federal generic theft offense.[11]

---

[11] At least one unpublished Ninth Circuit case had treated robbery under section 211 as an "aggravated felony theft offense," albeit without discussion. (*Castillo-Interiano v. Holder* (9th Cir. 2012) 474 Fed.Appx. 691.) Unpublished Ninth Circuit decisions issued after January 1, 2007, are citable

17

In our view, the absence of an on-point published decision from the Ninth Circuit does not demonstrate a likelihood that Rubio-Baez would *not* have been advised his robbery conviction would be an aggravated felony for purposes of the INA. At the very least, it should have been clear even before *Martinez-Hernandez* that there was reason to anticipate robbery would be considered an aggravated felony under 8 U.S.C. section 1101(a)(43)(G).[12] The

---

to courts within the circuit for persuasive value. (U.S. Cir.Ct. Rules (9th Cir.), rule 36-3; Fed. Rules App.Proc., rule 32.1 and Advisory Com. Notes to subd. (a) [citation for persuasive value].)

[12] As the People suggest, Rubio-Baez might also be deportable under 8 U.S.C. section 1227(a)(2)(A)(i), for commission of a crime involving moral turpitude for which a term of at least one year was imposed. Robbery under section 211 is a crime of moral turpitude for this purpose. (*Mendoza v. Holder* (1990) 623 F.3d 1299, 1303-1304.)

Whether 8 U.S.C. section 1227(a)(2)(A)(i) applies to Rubio-Baez's 2013 offense appears to depend on what date he is determined to have lawfully entered the United States. The moral turpitude provision makes deportable "[a]ny alien who . . . is convicted of a crime involving moral turpitude *committed within five years* (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) *after the date of admission . . . .*" (8 U.S.C. § 1227(a)(2)(A)(i), italics added.) The INA defines "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." (8 U.S.C. § 1101(a)(13)(A).)

Rubio-Baez testified that he came to this country with his parents in 2003 but did not say whether their entry was lawful. If it was, the 2013 robbery might not have qualified as a moral turpitude aggravated felony because it would have been committed more than five years after Rubio-Baez's date of admission. But the probation report stated that Rubio-Baez was undocumented when he entered, in which case the date of entry would not be considered his date of admission. Rubio-Baez obtained temporary legal status when he received his U visa in 2011; if issuance of the visa establishes his date of admission, it would appear the 2013 robbery would be considered an aggravated felony under 8 U.S.C. section 1227(a)(2)(A)(i).

18

state of the law therefore does not provide contemporaneous corroboration of Rubio-Baez's inability to understand this consequence of his plea.

Rubio-Baez, of course, asserts that his public defender did not explain these immigration consequences to him. He maintains the trial court rejected this assertion based on the facts that he signed the plea form saying the plea "will" have immigration consequences and that the attorney who represented him in 2013 did not submit an affidavit. As to the latter, Rubio-Baez argues the trial court erred because "[a]n affidavit of counsel is not required as long as there is some contemporary corroborating evidence" (*Rodriguez, supra,* 68 Cal.App.5th at p. 322), which he believes there is in this case.

In *Rodriguez,* although the public defender who represented the defendant at the time of her plea in 2005 did not submit an affidavit, the supervising attorney for the public defender's office at the time declared that he had maintained custody and control of the closed case files and there was no indication in the extensive file notes written by the attorney who represented the defendant that the attorney ever examined the immigration consequences of the plea or advised the defendant about them. (*Rodriguez, supra,* 68 Cal.App.5th at p. 317.) Moreover, the declarant stated that prior to the 2010 decision in *Padilla, supra,* 559 U.S. 356, which held that an attorney's failure to advise a client of the potential immigration consequences of pleading guilty to a criminal charge constitutes ineffective assistance of counsel, " 'it was not the common practice of defense counsel to research or

The record is not sufficiently developed on this point for us to reach any conclusion, nor should we attempt to do so when the issue was not raised in the trial court.

19

advise clients regarding the specific immigration consequences of a particular plea.' " (*Rodriguez,* at p. 317.)

Rubio-Baez did not present the trial court with any such corroborating evidence. The trial court observed that there was no evidence from Rubio-Baez's attorney at the time of the plea to show what he did or failed to do, or what his regular practice would have been, and that Rubio-Baez had a motive to portray the conversation in his own favor. Regarding the statement in Rubio-Baez's declaration that his plea was based on the understanding he " 'would not have any serious immigration consequences,' " the trial court stated, "without knowing what [his attorney] did or at least what his practices were if he couldn't remember the case, the idea that . . . my attorney said don't worry about it, it just doesn't ring true." Although the court was discussing his declaration, it also heard Rubio-Baez testify and its credibility determination based on that testimony must be afforded "particular deference." (*People v. Alatorre, supra,* 70 Cal.App.5th at p. 755.) "An appellate court may not simply second-guess factual findings that are based on the trial court's own observations." (*Vivar, supra,* 11 Cal.5th at p. 527.)

As to the advisement, Rubio-Baez correctly observes that the fact a section 1016.5 advisement was given is not conclusive proof the defendant understood and accepted the immigration consequences of the plea. (*People v. Patterson* (2017) 2 Cal.5th 885, 895-896 (*Patterson*).) Although he recognizes that the advisement he received stated the immigration consequences "will" result, rather than "may" result as stated in section 1016.5, Rubio-Baez fails to sufficiently grapple with the significance of this difference.

Several cases have held the more definitive advisement does not necessarily preclude a defendant from establishing that he or she did not

20

understand the immigration consequences of a plea.  (*People v. Lopez* (2021) 66 Cal.App.5th 561, 577 (*Lopez*); *In re Hernandez* (2019) 33 Cal.App.5th 530, 545 (*Hernandez*); *Camacho, supra,* 32 Cal.App.5th at p. 1011, fn. 8.)  But that is not to say the distinction between advisements stated in terms of "will" rather than "may" is irrelevant.

*Patterson* made this point in explaining why the section 1016.5 advisement that a conviction " 'may' " have adverse immigration consequences cannot be taken as providing notice that a given defendant faces an " 'actual risk' " in the circumstances of his or her case.  (*Patterson, supra,* 2 Cal.5th at pp. 895-896.)  "A defendant entering a guilty plea may be aware that some criminal convictions may have immigration consequences as a general matter, and yet be unaware that a conviction for a specific charged offense will render the defendant subject to mandatory removal. . . .  And for many noncitizen defendants deciding whether to plead guilty, the 'actual risk' that the conviction will lead to deportation—as opposed to general awareness that a criminal conviction 'may' have adverse immigration consequences— will undoubtedly be a 'material matter[]' that may factor heavily in the decision whether to plead guilty."  (*Ibid.*)  *Patterson* explained that while it may be sufficient to inform a defendant that a plea "may" have adverse immigration consequences where the consequences are unclear or uncertain, when federal law makes clear that a conviction will result in deportability*,* counsel has the obligation to so advise the defendant and "[t]he generic advisement under section 1016.5 is not designed, nor does it operate, as a substitute for such advice."  (*Id.* at p. 898.)

*Lopez* and *Hernandez* relied on *Patterson* in holding that an advisement stating adverse immigration consequences "will" result from a plea is " 'akin to the "generic advisement" ' " required by section 1016.5 and therefore does

21

not substitute for advice of counsel in every case. (*Lopez, supra,* 66 Cal.App.5th at p. 577; *Hernandez, supra,* 33 Cal.App.5th at p. 545.) But, as *Lopez* expressly acknowledged, the effect of the advisement "depend[s] on the surrounding circumstances." (*Lopez*, at p. 577.) *Patterson* explained that a trial court "may take into consideration the defendant's reaction to the section 1016.5 advisement—for example, whether the defendant acknowledged understanding the advisement and whether he or she expressed concerns about possible deportation consequences or sought additional time to consult with counsel. These considerations, along with any others that bear on the defendant's state of mind at the time of the plea, may assist courts in evaluating a later claim that the defendant would not have entered the plea had he or she understood the plea would render the defendant deportable." (*Patterson, supra,* 2 Cal.5th at p. 899.)

In *Lopez* and *Hernandez,* the circumstances dictated that the immigration advisement not be taken as conclusive. In *Lopez,* according to both the defendant and his attorney, review of the eight-page plea form took no more than five minutes, and they did not discuss the immigration paragraph; the attorney testified that he read the paragraph verbatim from the form and did not explain or expand on it. (*Lopez, supra,* 66 Cal.App.5th at p. 578.) In *Hernandez,* the attorney did not recall discussing whether the conviction could affect the defendant's immigration status, being aware of her status or thinking she could be deported, and his declaration said nothing about his custom or practice with regard to clients' immigration status, researching potential immigration consequences and advising clients about such consequences before they entered guilty pleas. (*Hernandez, supra,* 33 Cal.App.5th at pp. 545-546.) Also, the trial court in *Hernandez* did not

22

refer to immigration consequences when it took the defendant's plea. (*Id.* at pp. 537-538.)[13]

On the other hand, the court in *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, relied on the "mandatory" language of the immigration advisement in rejecting a defendant's claim that his attorney did not explain the immigration consequences of his plea and he would not have accepted it if he had been advised. Unlike the situations in *Lopez* and *Hernandez*, Abdelsalam's attorney told the court at the plea hearing that she had had sufficient time to discuss immigration consequences with the defendant and had explained them to him, contradicting the defendant's claim that counsel had not explained the consequences, and the defendant "presented no independent evidence that he was told anything other than that he would be deported." (*Abdelsalam,* at pp. 660, 664.) The *Abdelsalam* court reasoned: "During the taking of the plea, [the defendant] was told orally and in writing that he *will* be deported. Not that he 'might' be deported, or that he 'could' be

_____

[13] In *Camacho, supra,* 32 Cal.App.5th 998, the court noted, "Although in the trial court defendant was advised that his plea '*will* result' (italics added) in adverse immigration consequences, defendant presented sufficient evidence of his lack of understanding such that the court's advisement cannot be taken as irrebuttable proof that defendant likely would have entered his plea notwithstanding those consequences." (*Id.* at p. 1011, fn. 8.)

Curiously, Rubio-Baez asserts that the advisement he was given was "not as strongly worded" as the one in *Camacho.* The advisement in *Camacho* stated, "If you are not a citizen of the United States your conviction in this case will result in your being deported, excluded from the U.S., and denied naturalization." (*Camacho, supra,* 32 Cal.App.5th at p. 1002, fn. 2.) Rubio-Baez's plea form, as we have described, stated that the conviction "**will** have the consequences of <u>deportation</u>, <u>exclusion</u> from admission to the United States or a denial of naturalization," and the oral advisement told him the conviction "will have the consequence of deportation, exclusion from admission to the United States and denial of naturalization." We perceive no meaningful difference between the advisements in this case and in *Camacho.*

23

deported. [The defendant's] argument that he was not aware of the mandatory nature of the deportation flies in the face of the mandatory language used to describe the likelihood of deportation. [The defendant] is not entitled to simply ignore the admonitions he was given about the consequences of the plea and argue that he unilaterally assumed he would be treated in direct contravention of what he was advised orally and in writing." (*Id.* at p. 663.)

The present case is more like *Abdelsalam* than like *Lopez* and *Hernandez* with respect to the significance of the mandatory language in the immigration advisement.[14] On the plea form, the preprinted language of paragraph 8 states: "I understand that if I am not a citizen, conviction of the offense for which I have been charged **will** have the consequences of deportation, exclusion from admission to the United States or a denial of naturalization." In addition to the bold printed text highlighting the form language, the word "will" is underlined in handwriting, as are the words "deportation" and "exclusion." These notations not only support an inference that the provision was discussed, consistent with Rubio-Baez's acknowledgement that he discussed his immigration status with his attorney, but also suggest its essential terms were emphasized. At the hearing, the

---

[14] Factually, Abdelsalam was quite different from the present case. The defendant's ties to the United States were the opposite of compelling: He had only recently arrived, had been admitted on a fraudulently procured fiancé visa and had been arrested for stalking, assaulting, burglarizing and threatening the defrauded fiancée. (*Abdelsalam, supra*, 73 Cal.App.5th at p. 658.) Regarding the defendant's failure to present evidence that he had reason to expect an immigration neutral disposition was possible, the Abdelsalam court commented, "[a]ppellant has not explained why anyone would reasonably have expected that ICE would forgo deportation proceedings against someone who admitted in writing they were temporarily getting married solely to obtain citizenship." (*Id.* at p. 666.)

court asked Rubio-Baez if he understood that his conviction "will" have the consequence of deportation, exclusion and denial of naturalization, and he responded, "Yes."[15] Rubio-Baez gave no indication he had any questions about the plea or its consequences. (*Abdelsalam, supra,* 73 Cal.App.5th at p. 664 ["Nothing about appellant's oral and written responses during the plea process indicated he was confused about the multiple advisals that he would be deported"].) The circumstances do not militate in favor of dismissing the advisement as a generic warning contradicted by the evidence.

At the hearing on his motion to vacate, Rubio-Baez testified that his attorney did not tell him these immigration consequences were mandatory and permanent and did not advise him he could consult with an immigration attorney. But he presented no evidence other than his own testimony regarding what his attorney told him or failed to tell him, what his attorney's general practices were with respect to advising clients about immigration issues or what his attorney did or did not understand about the immigration consequences of a second degree robbery conviction. In light of the facts that Rubio-Baez was told the plea "will"—not "may"—result in stated adverse immigration consequences, and that robbery "is obviously a very serious offense," the trial court did not find credible Rubio-Baez's uncorroborated statements that he did not think the conviction would have serious immigration consequences. As this determination was based on Rubio-Baez's

---

[15] Rubio-Baez urges that because the plea form he signed stated the conviction will have the "consequence" (singular) of deportation, exclusion "or" denial of naturalization (disjunctive), it could be read as meaning only one of the three consequences would be implemented. In fact, the form uses the plural "consequences." The trial court asked Rubio-Baez if he understood the plea would have the "consequence of deportation, exclusion from the United States *and* denial of naturalization" (italics added), and he said he did.

25

testimony at the hearing as well as on his written declaration, we must defer to the trial court's credibility determination.

**B.  Rubio-Baez Has Not Demonstrated Prejudice.**

With respect to corroboration of his assertions that he would not have entered his plea if he had properly understood the immigration consequences, Rubio-Baez argues the trial court "gave short shrift to the evidence of his lifelong residence in and connection to the United States and the presence of his family here.  As the trial court stated, Rubio-Baez's statements on these matters were vague.  He declared that at the time of the plea, "I had family, community ties, obligations, and opportunities in the United States, and I would have faced extreme hardship if I was deported to my country."  He did not further explain his ties to the United States.  The record reflects that in 2013 he had been in this country for 10 years, from age 17 to 27.  He had graduated from high school in 2005, attended two years of junior college, and worked in the financial services industry until he lost his job in November 2012.  According to the probation report, although he had come to the United States with his parents, both parents had subsequently returned to Mexico; Rubio-Baez told the police that part of his motivation for the robbery was to obtain money to send to his mother in Mexico.  He had never been married and had no children.  He was living alone at the time of his arrest and planned to live with a cousin in San Jose upon release from custody.

Rubio-Baez likens the "objective evidence . . . of details" about his "strong personal ties" to the United States to those found to establish contemporaneous corroboration in *Vivar*.  To the contrary, comparison with *Vivar* illustrates how little Rubio-Baez offered to corroborate his assertion that, at the time of his plea, "[t]he right to remain in the United States was

26

more important to me than any potential jail sentence." The defendant in *Vivar* had been in the United States for 40 years, having been brought here as a lawful resident at age six; his mother, wife, children and grandchildren were all citizens; and at the time he was deported, his wife was undergoing radiation treatment for a medical condition and his son, who was serving in the United States Air Force, was about to be deployed to the Middle East. (*Vivar, supra*, 11 Cal.5th at pp. 516-517, 530.) Moreover, there was evidence of his state of mind at the time he entered his plea: His attorney's recollection and contemporaneous notes reflected Vivar's concern with the immigration consequences of his plea; a letter Vivar wrote to the court a month after his plea described his connections to the United States and pleaded to be allowed to stay; and a letter he wrote a few months later stated that counsel had never advised him his plea would result in deportation and he never would have entered the plea if he had been aware of this. (*Id.* at pp. 530- 531.) Nothing like this contemporaneous evidence exists in the present case.

Other cases similarly illustrate the point. In *Mejia*, for example, the defendant had been in the United States for eight years, since age 14; his wife and baby, his mother and six siblings were all here; and the only family member remaining in Mexico, his father, had died just before the defendant entered his plea. (*Mejia, supra*, 36 Cal.App.5th at p. 872.) The defendant in *Rodriguez* had been in the United States since she was one year old; her mother was a citizen, her father was a lawful resident pending naturalization, and her sisters all lived here; and at the time of her plea, she was in a committed relationship, had two children and was pregnant with her third. (*Rodriguez, supra*, 68 Cal.App.5th at p. 316.) We do not mean to suggest these cases set some sort of minimum ties to corroborate a later-

27

expressed statement about the significance the defendant attached to remaining in the United States at the time of the plea. They do, however, illustrate how little Rubio-Baez provided in this regard to corroborate his statements in 2021 that staying in the United States was his paramount concern when he entered his plea in 2013.

Other factors in the record also lead us to conclude Rubio-Baez failed to demonstrate a reasonable probability that he would not have accepted the plea bargain if he had been fully apprised of the immigration consequences. While the trial court observed that it had no information about the strength of the case against Rubio-Baez, the probation report in our record indicates the case was extremely strong: Rubio-Baez was found near the bank just after the robbery, in possession of the stolen money; was identified by the bank employee from whom the money was taken; and admitted the robbery to the police. His chances of avoiding conviction at trial were minimal and, in addition to a potentially longer sentence, conviction after trial would have carried the same immigration consequences.

The plea bargain offered Rubio-Baez a possibility of avoiding a conviction that would be deemed an aggravated felony under federal law. As earlier indicated, 8 U.S.C. section 1101(a)(43)(G) defines as an aggravated felony a theft offense "for which the term of imprisonment [is] at least one year." This qualification refers "to the actual sentence imposed by the trial judge." (*Alberto-Gonzalez v. I.N.S.* (9th Cir. 2000) 215 F.3d 906, 910.) Rubio-Baez's plea bargain specified a maximum sentence of two years (the lower term for second degree robbery (§ 213, subd. (a)(2)) but it did not require the court to impose a prison term and did not specify the length of any jail term imposed in granting probation. In fact, Rubio-Baez was granted probation with a one-year jail term, but the court could have imposed a shorter jail

28

term and, if it had done so, Rubio-Baez's offense would not have qualified as an aggravated felony under 8 U.S.C. section 1101(a)(43)(G). Such a possibility would have been far less likely if he had been convicted after trial.

The record also indicates Rubio-Baez would have had no reason to expect to be able to negotiate a more advantageous plea bargain. In addition to robbery, Rubio-Baez was charged with three other theft-related offenses— burglary (§ 460, subd. (b)), theft of property exceeding $950 (§ 487, subd. (a)), and possession of stolen property (§ 496, subd. (a))—as well as possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)). Under Rubio-Baez's plea bargain, he obtained the benefit of having these four additional charges dismissed, as well as two separate misdemeanor cases; limiting his sentence exposure to two years; and having the court consider residential treatment.[16] Robbery—a strike offense (§§ 667.5, subd. (c)(9), 1192.7, subd. (c)), as the plea agreement specified and required Rubio-Baez to admit—was the most serious of the charges. Nothing in the record supports the idea that the People would have agreed to a plea to one of the less serious charges instead; the prosecutor at the motion hearing represented that due to

---

[16] The record reflects that Rubio-Baez had become addicted to methamphetamine in the approximately 18 months preceding his offense; the probation report states he had applied to 20 treatment programs and, as of the date the report was written, had been accepted at two; and the 2013 sentencing court made his jail sentence modifiable to residential treatment. Rubio-Baez now argues the trial court disregarded his assertion that he "entered the plea because he wanted to enter into [a] treatment program and continue with his life," but he did not mention this point in his declaration or his testimony at the hearing on his motion to vacate.

office policy, because Rubio-Baez's offense was robbery, it was "extremely unlikely" her office would have offered a different plea.[17]

"A defendant without any viable defense . . . will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial" because the defendant "will be highly likely to lose at trial" and therefore "highly likely" to accept a plea." (*Lee, supra,* 137 S.Ct. at p. 1966.) Such a defendant might rationally reject a plea offer if "the respective consequences of a conviction after trial and by plea . . . are, from the defendant's perspective, similarly dire"; if avoiding deportation is the critical factor and the plea will certainly lead to deportation, a trial that will "[a]*lmost* certainly" have the same result may seem preferable. (*Id.* at pp. 1966, 1968-1969.) The defendant in *Lee,* who pleaded guilty to an offense subjecting him to mandatory deportation after his attorney erroneously assured him he would not be deported if he entered the plea, demonstrated prejudice through contemporaneous evidence substantiating his allegations that deportation was "*the* determinative factor" for him and he "would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a 'Hail Mary' at trial." (*Lee, supra,* 137 S.Ct. at p. 1967.)[18]

---

[17] The trial court suggested that because the other felonies Rubio-Baez was charged with were "theft-related," they would have left him "in the same boat." This appears to be true with respect to the charge of possessing stolen property (§ 496), which the Ninth Circuit has held to be an aggravated felony under 8 U.S.C. section 1101(a)(43)(G). (*Verdugo-Gonzalez v. Holder* (9th Cir. 2009) 581 F.3d 1059, 1060.) Second degree burglary and grand theft are not categorically federal generic theft or burglary offenses. (*Descamps v. U.S., supra,* 570 U.S. at p. 277; *Lopez-Valencia v. Lynch* (9th Cir. 2015) 798 F.3d 863, 866 and fn. 1.)

[18] The defendant in *Lee* sought to vacate his conviction on grounds of ineffective assistance of counsel. (*Lee, supra,* 137 S.Ct. at pp. 1962-1963.) His evidence showed he had been in the United States almost 30 years, had

Here, as trial court said, "the only thing . . . contrary to the plea form and the transcript [is] his declaration from many, many years later."

Rubio-Baez has not shown a reasonable probability that he would not have entered his plea if he had understood it would make him subject to mandatory deportation and permanent exclusion.[19]

## DISPOSITION

The order denying Rubio-Baez's section 1473.7 motion is affirmed.

---

established two businesses, and was the only family member in the United States who could care for his elderly parents, who were naturalized citizens; he had asked his attorney repeatedly whether there was a risk of deportation; the attorney acknowledged he would have advised the defendant to go to trial if he had known a guilty plea would lead to deportation; both the defendant and the attorney testified that the defendant would have gone to trial if he had known his plea would lead to deportation; and the plea colloquy reflected the defendant's concern with deportation. (*Id.* at pp. 1963, 1967-1969.)

[19] Rubio-Baez's opening brief includes an argument that his unawareness of the immigration consequences of his plea supports vacating the plea under section 1018. Under section 1018, "[a]t any time before judgment, or within six months after an order granting probation if entry of judgment is suspended, a trial court may permit a defendant to withdraw a guilty plea for 'good cause shown.' (§ 1018.)" (*Patterson, supra,* 2 Cal.5th at p. 894.)

Rubio-Baez does not explain how his claim of mistake and failure to understand, insufficiently corroborated for purposes of section 1473.7, would be sufficient for purposes of section 1018. His assertion that his ability to meaningfully understand and accept the immigration consequences of his plea "cannot be presumed based on a standard advisement that merely described the possibility of removal as something that may happen as a consequence of the plea" ignores the fact that he was advised the plea "will" have these consequences.

In any event, Rubio-Baez made clear in the trial court that his motion was *not* based on section 1018, telling the court, "this is not a [section] 1016.5 or a [section] 1018 motion." We will not address this argument further.

_____

STEWART, J.

We concur.

_____

RICHMAN, Acting P.J.

_____

VAN AKEN, J. *

*People v. Rubio-Baez* (A163056)

_____

   * Judge of the San Francisco Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.